Patrick J. ELLERMAN, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 79A02–0206–CR–437.

Court of Appeals of Indiana.

April 21, 2003.

Thomas J. O'Brien, O'Brien & Dekker Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Grant H. Carlton, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Patrick J. Ellerman appeals his conviction of Attempted Murder,[1] a class A felony, Attempted Aggravated Battery,[2] a class B felony, Criminal Recklessness by Means of a Deadly Weapon,[3] a class D felony, Battery,[4] a class A misdemeanor, and the determination that he is a habitual offender.[5] Ellerman presents the following restated issues for review:

1. Ind.Code Ann. § 35–42–1–1 (West, PREMISE through 2002 1st Special Sess.); Ind. Code Ann. § 35–41–5–1 (West 1998).

2. I.C. § 35–42–2–1.5 (West, PREMISE through 2002 1st Special Sess.); I.C. § 35–41–5–1.

3. I.C. § 35–42–2–2 (West 1998).

4. I.C. § 35–42–2–1.3 (West, PREMISE through 2002 1st Special Sess.).

5. Ind.Code Ann. § 35–50–2–8 (West, PREMISE through 2002 1st Special Sess.).

1. Did the trial court adequately advise Ellerman of the dangers of self-representation?
2. Did Ellerman's convictions of attempted murder and attempted aggravated battery violate the Indiana Constitution's double jeopardy prohibition?
3. Did the trial court err in permitting the State to proceed on an amended information?

We affirm in part, reverse in part, and remand.

The facts favorable to the convictions are that Debra Martinez had two children, including six-year old Matthew. Ellerman was Matthew's father. On the night of August 26, 2001, Martinez was staying at the home of her friends, Jason and Michelle Powell. At the time, Martinez had a protective order against Ellerman. Martinez was awakened from sleep when she heard someone beating on the doors and windows of the Powells' home. When she realized it was Ellerman, Martinez roused her children and took them into a bedroom. When she returned to the scene of the commotion, Martinez saw Michelle standing in the doorway arguing with Ellerman and blocking his access to the house. Martinez walked to the door and attempted to calm Ellerman. Ellerman "sort of kne[ed] the inside of [Michelle's] leg to push her aside," *Appellant's Appendix* at 170–71, grabbed Martinez's hair, and hit her on the side of the head. Police were called. Martinez and Ellerman eventually ended up outside the house, where Ellerman begged Martinez to leave with him and talk with him. Martinez refused. Ellerman left several moments later, before police arrived.

After speaking with police and waiting a few hours, Martinez and Powell went back to sleep. Martinez was then awakened by the sound of Michelle screaming, "[O]h my god Debbie, he's back but this time he's got a gun." *Id.* at 176. Martinez heard glass breaking. After taking Matthew to the Powells' bedroom, Martinez returned to the living room to attempt to resolve the situation. Michelle was already in the room. Martinez was standing near the couch when a concrete block crashed through a nearby window. She looked outside and saw Ellerman. The two began to argue through the broken window. He told Martinez that he loved her and would do whatever it took to get her. Ellerman also told her that "if he couldn't have [her], he didn't know what he would do." *Id.* at 175. He also told her he had five bullets in the gun. Finally, Ellerman informed her that he had cocaine in syringes and would kill himself if she did not go with him. Martinez saw Ellerman administer an injection while they were arguing.

While this transpired, Ellerman kept moving the gun in and out of the window. Finally, Ellerman fired the gun and the bullet struck a wall in the room in which Martinez and Michelle were standing. No one was struck. Martinez grabbed an old BB gun and threw it out the window to keep Ellerman from leaning inside. Shortly thereafter, Ellerman "fell to the ground, [and] started flopping and convulsing," presumably as a result of the drugs he had injected. *Id.* at 178. After several moments, Ellerman got up, walked to his car, and drove away. A short time later, Ellerman's car crashed into a tree. He was transported from the scene of the accident to a hospital.

As a result of the incidents at the Powells' house, in addition to the offenses of which he was convicted, Ellerman was charged with invasion of privacy, criminal mischief, and an additional count of attempted murder. On April 4, 2002, Ellerman filed a petition seeking permission to represent himself at trial. In support of

that petition, Ellerman stated that "he had experience in such a matter, as he ha[d] represented himself before." *Id.* at 41. He also asked the court to appoint stand-by counsel for consultation purposes. At the hearing on the motion for self-repre-sentation, the following exchange took place:

BY THE COURT: All right. And do you understand you're entitled to be represented by a lawyer, do you under-stand that?

BY MR. ELLERMAN: Yes, I under-stand that.

BY THE COURT: And if you don't have the money, the means or the prop-erty to hire a lawyer and you want to be represented by a lawyer—it the Court will appoint an attorney for you at no cost to you, do you understand that?

BY MR. ELLERMAN: Yes.

BY THE COURT: Okay. Now, Patrick, what kind of education have you got?

BY MR. ELLERMAN: A high school diploma.

BY THE COURT: And do you under-stand a lawyer is highly trained and knows the rules of evidence and—

BY MR. ELLERMAN: Yeah, I'm pret-ty familiar it seems with the law on the opposite side.

BY THE COURT: What experience have you had in representing yourself in the past?

BY MR. ELLERMAN: I represented myself in Judge Zeman's court and got the case dismissed.

BY THE COURT: You know that doesn't necessarily mean you're gonna get it dismissed in here, don't you?

BY MR. ELLERMAN: Oh yeah. I know that.

BY THE COURT: Okay.

BY MR. ELLERMAN: I hold myself completely responsible.

*Id.* at 60–61. The court then explained to Ellerman that it would appoint standby counsel for Ellerman and that Ellerman could change his mind at any time and the court would "review the arrangement." *Id.* at 61. The court reminded Ellerman of a quote to the effect that anyone who represented themselves in a court of law had a fool for a client. At that point, the court and the prosecutor made the follow-ing remarks:

BY THE COURT: Yeah. Is there any-thing else I should ask on this? I—it seems like there's all kinds of things.

BY MR. ELLERMAN: Yes, I under-stand.

BY THE COURT: [Prosecutor] John Meyers?

BY MR. MEYERS: Yeah, I—Judge, I'd just like to make a comment about it.

BY THE COURT: Okay.

BY MR. MEYERS: I understand that in Indiana there's a right to self-repre-sentation but just to make sure Mr. Ellerman knows that standby counsel, Mr. O'Brien is not going to be asking questions, making presentations to the jury or anything like that, and that as representative of the state [sic] I'm go-ing to be objecting anytime Mr. Eller-man tries to testify as opposed to fol-lowing the form, the proper format of questions and so on. He's—we're not going to—this is a serious matter, it's an attempted murder charge, and we wouldn't give him the leeway that we might in a much lesser charge, he's go-ing to have to follow the rules. And it's been my experience people who've rep-resented themselves, and I'm sure the Court's dialogue should have just made that clear, that there is a—that people who try to represent themselves in a case such as this in this level of court are amazed at the difference between

this court and a minor offense charge, and in—by the middle of the case if not earlier than that realize they have no idea what they're doing. And even with Mr. O'Brien in it, and we would press this very hard, we're not gonna stop our aggressive approach to this case as our approach to representing our clients just because Mr. Ellerman's representing himself. I mean, it's just not gonna happen. And so I think for Mr. Ellerman—I'll just voice my opinion for whatever it's worth, you know, Tom O'Brien is one of the best lawyers around here, he's trained, he's experienced, he's got a lot of advance schooling, and is recognized as such, and to drop him out of active participation for Mr. Ellerman to represent himself is one of the stupidest things I think I've ever encountered.

**BY THE COURT:** Patrick, you've heard what the prosecutor said, do you understand that?

**BY MR. ELLERMAN:** Yeah.

**BY THE COURT:** And do you still want me to grant you this petition for self-representation filed April 4 of 2002 which was filed by Mr. O'Brien on your behalf?

**BY MR. ELLERMAN:** Yes.

**BY THE COURT:** Okay?

**BY MR. ELLERMAN:** I want you to.

**BY THE COURT:** Okay. You have a right to represent yourself, I feel like I have nothing else to admonish you about. Good luck to you.

*Appellant's Appendix* at 62–64.

Later, at a hearing on a motion in limine submitted by Ellerman, the court revisited the subject of Ellerman's decision to represent himself, as follows:

**BY THE COURT:** Now, Mr. Ellerman, I've talked to you before . . . about you representing yourself. And under the Indiana Constitution you have the constitutional right to represent yourself.

**BY MR. ELLERMAN:** Yeah.

**BY THE COURT:** But quite frankly, I believe you're making a bad decision representing yourself because you've indicated to me in the past you're not lawyer trained, do you have a high school education?

**BY MR. ELLERMAN:** Yeah.

**BY THE COURT:** And your answer is yes?

**BY MR. ELLERMAN:** Yes.

**BY THE COURT:** And you're—the most experience that you've had is that you tried a jury trial yourself down in Judge Zeman's court and you won and you figure if you represent yourself once and you win that makes you capable of representing yourself in this case.

**BY MR. ELLERMAN:** No, that's not the case at all.

**BY THE COURT:** Okay.

**BY MR. ELLERMAN:** It's just—

**BY THE COURT:** But I just want to admonish you that I can't—I'm gonna allow you to go forward, I've appointed standby counsel here and standby counsel is a very skilled trial lawyer, very competent attorney, and I believe you would be better served if he represented you rather than just being standby counsel, but I respect and appreciate what you're asking and I'm required to allow you to represent yourself. But I want to let you know I'm not gonna be your lawyer.

*Id.* at 70–72. Ellerman was convicted as set out above following a jury trial.

1.

Ellerman contends the trial court did not adequately advise him of the dangers of self-representation, making his decision

to proceed in that fashion an uninformed one.

■■■ The Sixth Amendment right to representation by counsel is of critical importance in protecting the fundamental right to a fair trial. *Poynter v. State*, 749 N.E.2d 1122 (Ind.2001). Because the " 'average defendant does not have the professional legal skill to protect himself' at trial, it is required that a defendant's choice to appear without professional counsel be made intelligently." *Id.* at 1125 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462–63, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Our courts have pondered the nature of the inquiry that courts should undertake when a criminal defendant expresses a desire for self-representation. That produced what appeared to be specific guidelines in *Dowell v. State*, 557 N.E.2d 1063 (Ind.Ct.App.1990), *trans. denied, cert. denied*, 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). In *Dowell*, this court held that a defendant must be advised of (1) the nature of the charges against him, (2) the possibility that there may be lesser included offenses within those charges, and (3) the possibility of defenses and mitigating circumstances surrounding the charges. The defendant should also be advised (4) that self-representation is almost always unwise, (5) that the defendant may conduct a defense that is to his detriment, (6) that the defendant will receive no special indulgence from the court and will have to abide by the same standards as an attorney, and (7) that the State will be represented by experienced professional legal counsel. With regard to the latter, the *Dowell* court indicated that the defendant should be "specifically" instructed that, unlike the defendant, an attorney has skills and expertise in matters critical in presenting a proper defense, including investigating and interrogating witnesses, gathering appropriate documen-

tary evidence, obtaining favorable defense witnesses, preparing and filing pre-trial motions, preparing appropriate written instructions for the jury, presenting favorable opening and closing statements, examining and cross-examining witnesses at trial, and recognizing objectionable, prejudicial evidence and testimony and making proper objections thereto. The *Dowell* court also indicated that the trial court should inquire into the defendant's mental capacity, educational background, and familiarity with legal procedures and rules of evidence. Finally, the court determined that a defendant should be advised that he cannot later claim inadequate assistance of counsel in the event that he chooses to proceed pro se. *Id.*

■■■ In *Leonard v. State*, 579 N.E.2d 1294 (Ind.1991), our supreme court indicated that the "guidelines" set out in *Dowell* do not "constitute a rigid mandate setting forth specific inquiries that a trial court is required to make before determining whether a defendant's waiver of right to counsel is knowing, intelligent, and voluntary." *Id.* at 1296. The Indiana Supreme Court recently reiterated its rejection of a rigid test in this regard when it stated, "There are no prescribed "talking points" the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Poynter v. State*, 749 N.E.2d at 1126. Nevertheless, courts are to make the determination "with the awareness that the law indulges every reasonable presumption against a waiver of this fundamental right." *Id.* Therefore, the law on this point requires that the advisement to a defendant seeking self-representation be such that he is made "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is

doing and his choice is made with eyes open.'" *Osborne v. State,* 754 N.E.2d 916, 920–21 (Ind.2001) (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). Finally, the court should not grant a request for self-representation unless it is satisfied that the defendant has the mental capacity to understand the proceedings. *Osborne v. State,* 754 N.E.2d 916. We review de novo a trial court's determination that the defendant validly waived the right to counsel. *Balfour v. State,* 779 N.E.2d 1211 (Ind.Ct.App.2002).

The court conducted a hearing on Ellerman's motion to represent himself. At that hearing, the court first clarified that Ellerman knew he was entitled to counsel and that one would be appointed if he could not afford to pay for one himself. When the court informed Ellerman that an attorney is highly trained and knowledgeable in matters such as the rules of evidence, Ellerman interrupted and stated that he was "pretty familiar it seems with the law on the opposite side." *Appellant's Appendix* at 60. Ellerman then explained that he had successfully represented himself in another proceeding. At that point, the trial court wondered aloud whether there were other matters to cover on the subject of Ellerman's self-representation. The prosecuting attorney spoke up and asked to "make a comment about it." *Id.* at 62.

The prosecutor assured Ellerman that the State would vigorously prosecute its case and would make no allowances for Ellerman's lack of professional legal training. The prosecutor attempted to impress upon Ellerman the difficulty of the task of representing himself, while at the same time praising the quality of standby counsel. Finally, the prosecutor told Ellerman that his decision to represent himself was "one of the stupidest things [he had] ever

encountered." *Id.* at 63. Although the foregoing comments were those of the prosecutor, they were made with the imprimatur of the court, and indeed were arguably made at the court's behest. Such is evident by the court's comment after the prosecutor had concluded his remarks, viz., "Patrick, you've heard what the prosecutor said, do you understand?" *Id.* In a subsequent hearing on a different matter, the trial court revisited the topic. After asking Ellerman whether he still wanted to represent himself, the court responded to Ellerman's affirmative answer by stating, "I believe you're making a bad decision representing yourself[.]" *Id.* at 71.

■ After reviewing the foregoing, we are satisfied that the court adequately advised Ellerman of the dangers and disadvantages of self-representation; therefore, the record establishes that Ellerman knew what he was doing and "his choice [was] made with eyes open." *Osborne v. State,* 754 N.E.2d at 920–21.

■ With respect to the second line of inquiry in deciding whether to permit self-representation, the court ascertained that Ellerman was a high school graduate. There is nothing in the appellate materials to suggest that Ellerman's general competency was such that it rendered him incapable of making a voluntary and informed (if ill-advised) decision in that regard. Moreover, Ellerman reported that he had undertaken to represent himself on a previous occasion, and indeed had been successful in that matter. The trial court did not err in permitting Ellerman to represent himself at trial.

### 2.

Ellerman contends that his convictions of attempted murder and attempted aggravated battery violate the Indiana Constitution's double jeopardy prohibition.

Article 1, section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." In Indiana, the double jeopardy analysis involves dual inquiries under what have come to be known as the "statutory elements test" and the "actual evidence test." *Davis v. State,* 770 N.E.2d 319 (Ind.2002). Those tests are described in *Richardson v. State,* 717 N.E.2d 32 (Ind.1999). Ellerman contends only that his convictions of both attempted murder and attempted aggravated battery violate the actual evidence test. The States agrees, and rightly so.

"The actual evidence test prohibits multiple convictions if there is 'a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.'" *Davis v. State,* 770 N.E.2d at 323 (quoting *Richardson v. State,* 717 N.E.2d at 53). The attempted murder conviction was based upon Ellerman's act of firing a handgun into the room in which Martinez was located. The charging information for the attempted aggravated battery conviction alleged that Ellerman, "did break a window and [discharge] a firearm into the residence where Michelle Powell and Debra Martinez were staying[.]" *Appellant's Appendix* at 9. Because Ellerman fired only one shot, it is clear that the conviction for attempted aggravated battery arose from the same evidence that also gave rise to the attempted murder conviction. Therefore, there is a reasonable possibility that the jury used the evidence proving the elements of attempted murder to also establish the elements of attempted aggravated battery. *See Davis v. State,* 770 N.E.2d 319. Both convictions cannot stand under the Indiana Double Jeopardy Clause. *Id.* Therefore, we vacate the conviction for attempted aggravated battery.

**3.**

Ellerman's jury trial opened on April 16, 2002. After the jury was selected, but before trial commenced, Ellerman objected to proceeding to trial on Count VIII. That charge had been added on or about January 4, 2002, but Ellerman claimed he did not become aware of the charge until that day—the day trial commenced. He complained that it was unfair to proceed on the charge when he was not aware of the charge until the last minute, and complained also that trial on that charge was erroneous because there had been no preliminary hearing with respect to that particular charge. Those questions are moot, however, because we have determined that the conviction flowing from that charge must be vacated. *Cf. Cuto v. State,* 709 N.E.2d 356 (Ind.Ct.App.1999) (after an aggravated battery conviction was reversed, an allegation of incompatibility between that charge and another charge became moot).

In summary, the conviction of attempted aggravated battery is reversed and this cause is remanded with instructions to vacate that conviction and to modify the sentence accordingly. The trial court is affirmed in all other matters.

Judgment affirmed in part, reversed in part, and remanded.

BROOK, C.J., and MATTINGLY–MAY, J., concur.